IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RONALD VINCENT WILLIAMS, | ) | |
| #239 426, a/k/a RONNIE WILLIAMS,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:15-CV-728-ECM-SMD |
| | ) | |
| JOSEPH WOMBLE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is pending before the court on an Amended Complaint (Doc. 13) filed by Ronald Vincent Williams ["Williams"], an indigent state inmate, against Joseph Womble, Karen Williams, Tara Walker, and Nurse McArthur.[2]  In his amended complaint, Williams alleges that his transfer to the Red Eagle Honor Farm ("Red Eagle") in 2014 was retaliatory in nature and involved a mistaken identity, improprieties occurred during his annual classification review in 2015, and medical documents were improperly removed from his prison medical file.  Williams seeks his release from prison, that he be

---

[1] The Court takes judicial notice of court records which reflect that in the numerous federal civil actions filed by Williams, he has variously identified himself as Ronnie Vincent Williams, Ronnie V. Williams, Ronald Vincent Williams, and Ronnie Williams with all variations utilizing the same inmate identification number—AIS No. 239426.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[2] In accordance with the prior orders and proceedings in this matter, this action if before the Court on Williams' amended complaint. Doc. 13.

recognized as "Ronald Vincent Williams" rather than "Ronnie Williams," and that he be awarded $8.3 million in damages from each defendant. *Id.*

Defendants filed answers, special reports, a supplemental special report, and supporting evidentiary materials addressing Williams' claims for relief.  (Docs. 21, 22, 26, 27, 40).   In these filings, Defendants deny they acted in violation of Williams' constitutional rights.  Upon receipt of Defendants' special reports, the Court issued an order directing Williams to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioning Williams "the court may at any time thereafter and without notice to the parties (1) treat the special reports and any supporting evidentiary materials as motions for summary judgment."  (Doc. 44) at 2.  Williams responded to Defendants' special reports, *see* (Docs. 38, 45), but his responses do not demonstrate there is any genuine issue of material fact. *See* (Doc. 44).  The Court will treat Defendants' reports as motions for summary judgment and resolve these motions in their favor.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment

"always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the non-moving party has failed to present evidence to support some element on which it bears the ultimate burden of proof. *Id.* at 322−324.

Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact.  Thus, the burden shifts to Williams to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case exists.  *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (holding that the court should consider facts pled in a plaintiff's sworn complaint when considering summary judgment).  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.  The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly

probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); Fed. R. Civ. P. 56(e).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).  Only disputes involving material facts are relevant, materiality is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248.

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also United States v. Stein,* 881 F3d 853 (11th Cir. 2018) (holding that a plaintiff's self-serving and uncorroborated, but not conclusory, statements in an affidavit or deposition may create an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . 'Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'").  "Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a

well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 Fed. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the Court, a *pro se* litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *See Beard v. 9Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's *pro se* status alone does not mandate this Court disregard elementary principles of production and proof in a civil case. Here, Williams fails to demonstrate a requisite genuine dispute of material fact to preclude summary judgment on his claims. *See Matsushita*, 475 U.S. at 587.

### III. DISCUSSION

#### A.   Injunctive Relief

Williams seeks his release from prison. (Doc. 13). When the effect of granting equitable relief under the civil rights statute would be to substitute a § 1983 action for a federal writ of habeas corpus challenging the basis for ongoing detention or for a petition under § 2254 to attack a state court conviction and/or sentence, a prisoner fails to state a claim under § 1983. *See Eutzy v. Tesar*, 880 F.2d 1010, 1011 (8th Cir. 1989); *Preiser*, 411 U.S. at 500. A plaintiff, therefore, cannot seek declaratory or injunctive relief relating to

his confinement and/or conviction in a § 1983 action.  *See Edwards v. Balisok*, 520 U.S. 641, 648 (1997); *Heck v. Humphrey*, 512 U.S. 477, 483-89 (1994); *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) ("when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus.").  Williams' request for injunctive relief is, therefore, due to be dismissed.

**B.     Absolute Immunity — Official Capacity Claims**

To the extent Williams requests monetary damages from Defendants in their official capacities, they are entitled to absolute immunity.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity."  *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  As the Eleventh Circuit has held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees].  There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity.  A State's consent to suit must be unequivocally expressed in the text of [a] relevant statute.  Waiver may not be implied.  Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted).  Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).  "Neither waiver nor

abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity."  Ala. Const. Art. I, § 14.  The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit."  *Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (consent is prohibited by the Alabama Constitution)).   "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it."  *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990)).   In light of the foregoing, Defendants, as employees of the Alabama Department of Corrections or acting as state agents, are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.  *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

## C. Qualified Immunity — Individual Capacity Claims

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is not merely a defense against liability but

immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted).  To receive qualified immunity, the public official must first prove he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  There is no dispute the correctional defendants here were acting within the course and scope of their discretionary authority when the incidents occurred.  Williams must, therefore, allege facts that, when read in a light most favorable to him, show that the correctional defendants are not entitled to qualified immunity.  *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show that: 1) a defendant committed a constitutional violation; and 2) the constitutional right a defendant violated was "clearly established."  *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004).  "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotation marks and citations omitted).  "Clearly established law" means: 1) "a materially similar case has already been decided"; 2) "a broader, clearly established principle that should control the novel facts of the situation"; or 3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary."  *Gaines v. Wardynsk*i, 871 F.3d 1203, 1208–09 (11th Cir. 2017)

(quotation marks and citations omitted).  The controlling authority is from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state."  *See id*. at 1209.  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law."  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted).  The Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."  *Gaines*, 871 F.3d at 1210.  "Exact factual identity with the previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law."  *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).  If a plaintiff cannot establish both elements to satisfy his burden, the defendants are entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case."  *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (*citing Pearson*, 555 U.S. at 241–42).

McArthur argues that he is entitled to qualified immunity.  (Doc. 26).  When the incident about which Williams complains occurred, McArthur was employed by Corizon, LLC, which held the contract with the Alabama Department of Corrections to provide healthcare to inmates in its custody.  (Doc. 27-1).  Consequently, McArthur's qualified immunity argument is foreclosed by *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999), *opinion amended* by 205 F.3d 1264 (11th Cir. 2000).  In *Hinson*, the Eleventh Circuit relied upon the reasoning of *Richardson v. McKnight*, 521 U.S. 399 (1997), where

the Supreme Court declined to extend qualified immunity to privately employed prison guards, to hold that qualified immunity may not be extended to privately employed prison physicians. Based on *Hinson,* McArthur cannot claim the protection of qualified immunity.

### D.    Property Claim

Williams complains McArthur, a physician's assistant employed by the prison health care provider, removed x-rays from his medical file that supported Williams' "true identity" regarding a car accident which caused him back injuries.[3] (Doc. 13). Construed liberally, the court considers Williams' allegation to assert a deprivation of property claim.

The Due Process Clause protects prisoners from being deprived of property without due process of law. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Under § 1983, the taking of property violates the Constitution when done without due process of law. *Parratt v. Taylor*, 451 U.S. 527, 537 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986).

"[A]n unauthorized, intentional deprivation of property by a state employee does not constitute a violation of the due process requirements of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Under Ala. Code § 41-9-60 (1975), the State Board of Adjustment can consider claims against the state or its agents. Because McArthur is an agent of the State of Alabama, Williams has a remedy under the state statute which he may pursue. If

---

[3] Williams states there is another inmate in the custody of the ADOC with the name "Ronnie Williams" with whom prison officials have misidentified him. The alleged "misidentification" about Williams complains is a common complaint in his many court filings.

the Board of Adjustment denies the claim, Williams may then sue in the appropriate state court for redress. *See Carmichael v. State Bd. of Adjustment*, 232 So. 2d 216 (Ala. 1947). If Williams is not satisfied with that decision, he can file an appeal in the appropriate state circuit court. *See* Alabama Small Claims Rule M, which provides: "A [small claims] judgment may be appealed to the circuit court by filing a notice of appeal in the office of the clerk of the small claims court within fourteen days from the date of the judgment[.]").

The post-deprivation remedies available to Williams under state law satisfy due process. Whether the alleged deprivation was intentional or otherwise erroneous, Williams has not been deprived of property without due process of law because he has an available post-deprivation remedy. *See Holloway v. Walker*, 790 F.2d 1170, 1173-74 (5th Cir. 1986) (finding no breach of federally guaranteed constitutional rights, even where a high-level state employee intentionally engages in tortuous conduct, as long as the state system as a whole provides due process of law). Defendant McArthur is entitled to summary judgment on this claim.

**E.     Medical Claim**

To the extent Williams' allegation against McArthur is properly considered to assert a claim of deliberate indifference to his medical needs, such claim likewise entitles Williams to no relief. To establish an Eighth Amendment claim about an alleged denial of adequate medical treatment, an inmate must, at a minimum, show those responsible for providing medical treatment acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th

Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248, 1254-55 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986). Specifically, correctional officials or prison medical personnel may not subject inmates to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir. 1989).

A correctional official or health care provider may be held liable under the Constitution for acting with "deliberate indifference" to an inmate's health when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994). A constitutional violation occurs only when a plaintiff establishes the existence of "a substantial risk of serious harm, of which the official is subjectively aware, . . . and [that] the official does not 'respond[] reasonably to the risk'. . ." *Marsh v. Butler County*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), (quoting *Farmer*, 511 U.S. at 844). "Even assuming the existence of a serious risk of harm and legal causation, the [defendant] must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists−and the [defendant] must also 'draw that inference.'" *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (quoting *Farmer,* 511 U.S. at 837). Thus, in order to survive summary judgment on his claim, Williams is "required to produce sufficient evidence of (1) a substantial risk of serious

harm; (2) the defendant[']s deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir. 1995).

Although the narratives in Williams' opposition are convoluted, the court considers his response to allege McArthur removed x-rays of his back and stomach taken at Staton in October 2014 because, in McArthur's opinion, as people age they develop back problems and if Williams wanted to stay at the Red Eagle facility and work away from the facility there was no need for the x-ray information to remain in his medical file. (Doc. 45). Williams contends that had all defendants allowed his "true identity" to go forth, his correct medical history would be contained in his prison medical file which would have shown he received treatment in the past for a car accident which left him with back problems. *Id.* Without having his correct medical history in his prison medical record, Williams complains he remains at risk and can trust no treatment prescribed or recommended by the health care providers. *Id.*

McArthur adamantly denies removing any documents from Williams' medical files, including x-rays or x-ray reports. McArthur states he would have no reason to remove any documents or records from Williams' inmate medical file and explains that x-rays and x-ray report are digitally stored by computer and easily reproducible by any prison medical provider or prison official. (Doc. 27-1).

Williams has failed to plead facts demonstrating deliberate indifference to a serious medical need. At best, the challenged conduct amounts to negligence. Williams does not allege he was suffering from a serious medical condition when the actions about which he

13

complains occurred or that McArthur knew of any such condition. Even if McArthur hypothetically is held to have violated some professional standard regarding Williams' contention he removed x-rays and/or x-ray reports from Williams' prison medical file, such claim could "only serve as a starting point for analysis that requires much more than negligence or malpractice." *Taylor,* 221 F.3d at 1259. Neither negligence, neglect, nor medical malpractice, however, rises to the level of a constitutional violation. *Estelle*, 429 U.S. at 104-05 (mere negligence in providing medical care is insufficient to violate the Constitution); *Mandel v. Doe*, 888 F.2d 783, 787-88 (11th Cir. 1989) (mere negligence or medical malpractice "not sufficient" to constitute deliberate indifference); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Mere medical malpractice . . . does not constitute deliberate indifference"); *see also Brinton v. Gaffney*, 554 F. Supp. 388, 389 (E.D. Pa. 1983) (A § 1983 claim "does not lie if a prisoner's complaint is directed at the wisdom or quality of the medical treatment he received . . ., even if that treatment is so negligent as to amount to medical malpractice.); *see also McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir.1997) (finding "[d]eliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind.").

Here, there is no indication McArthur knew of and disregarded an excessive risk to Williams' health or safety and no indication he did so in a manner that constituted unnecessary and wanton infliction of pain. Thus, Williams' Eighth Amendment claim against McArthur in his individual capacity fails. *See Farmer*, 511 U.S. at 837; *Taylor*,

221 F.3d at 1258.   Summary judgment is, therefore, due to be granted in Defendant McArthur's favor.

**F.     Claims Against the Correctional Defendants**

Williams' allegation against Defendants Womble, Williams, and Walker (collectively, "the correctional defendants"), concern matters stemming from Williams' belief he has been misidentified in the correctional system with another inmate named "Ronnie Williams."   He maintains that he should not have been transferred to Red Eagle in 2014 because, during a previous incarceration there, he filed complaints against a former warden of the facility and correctional staff who had worked under the former warden, including some of the named defendants, who remained employed there at the time of his return.   (Doc. 13).   While confusing, Williams appears to maintain that he should never have been transferred to Red Eagle because of his previous litigation and his transfer to the facility occurred because he and another ADOC inmate have similar names.   *Id.*   Williams also complains that the correctional defendants violated agency regulations during his classification review process.   *Id.*   Finally, Williams alleges the correctional defendants denied him a proper classification review because they made changes to his classification status with which he did not agree and because of issues surrounding his "true identity." *Id.*

Williams is confined in the Alabama state prison system on a sentence of twenty years imposed upon him in 2005—under the name "Ronnie V. Williams"— by the Circuit Court of Mobile County, Alabama for a manslaughter conviction.   The correctional

defendants state that when an inmate is sentenced to the Alabama Department of Corrections ("ADOC"), the inmate is identified by the name on the court transcripts sent from the state court to the Central Records Division of the ADOC.  (Docs. 22-1, 22-2, 22-3).

While incarcerated at Red Eagle, Williams was scheduled for a classification review on or about April 6, 2015.  Due to the number of inmates who leave Red Eagle during the day to work, the names of inmates receiving classification reviews for the month are listed in the inmate newsletter posted throughout the inmate dorms which allows for the twenty-four-hour advance notice requirement regarding inmate classification reviews.  After the classification specialist completes the written part of an inmate's review, the shift supervisor receives the document and gives it the inmate to read and review overnight.  The shift supervisor collects the signed inmate classification review sheets the next day and returns them to the classification specialist who enters them in the computer.  Inmates may contact the classification specialist if they have questions regarding their classification review.  (Docs. 22-4, 22-5).

Williams contends a Shift Commander tried to force him to sign his April 6, 2015, annual review to indicate his approval of its contents.  Defendant Walker states this is a common misconception among inmates. An inmate's signature on his classification review sheet does not mean the inmate "approves" of the contents of the classification review, and an inmate's signature is unnecessary to complete the process.  Whether an inmate signs his classification review sheet or refuses to do so is irrelevant in determining if the review

process proceeds normally. Regarding Williams' claim that he was forced to sign information different from what was agreed upon, Defendant Walker states she does not make "agreements" with inmates. Rather, she makes custody recommendations to the Central Review Board which are either approved or denied by the Board. This was the procedure followed by Defendant Walker during Williams' classification review in April 2015. Docs. 22-1, 22-4.

Williams' allegation that Defendants failed to comply properly with ADOC regulations regarding his inmate classification review entitles him to no relief. An alleged violation of departmental rules or policies, standing alone, does not infringe upon an inmate's constitutional rights. That state law or state agencies prescribe certain procedures does not mean those procedures acquire federal constitutional dimension. *Sandin v. Conner*, 515 U.S. 472, 481–82 (1995) (holding prison regulations are not intended to confer rights or benefits on inmates but are merely designed to guide correctional officials in the administration of prisons); *United States v. Caceres*, 440 U.S. 741, 751–52 (1979) (finding mere violations of agency regulations do not raise constitutional questions); *Magluta v. Samples*, 375 1269, 1279 n.7 (11th Cir. 2004) (noting that "procedural requirements set out in [an administrative] regulation are not themselves constitutional mandates"); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.1988) (finding that the due process clause of the Fourteenth Amendment creates "no legitimate claim of entitlement to a [prison] grievance procedure"); *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("[T]here is no federal constitutional liberty interest in having state officers follow state law or prison officials

follow prison regulations. . . ."); *Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987) (finding the adoption of mere procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process); *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) ("[F]ailure to follow prison rules or regulations do not, without more, give rise to a constitutional violation."); *see also Riccio v. Cty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1991) (finding that if state law grants more protections than Constitution requires state's failure to abide by its law is not a federal constitutional issue); *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1527–28 (11th Cir. 1987) (finding violation of state statute defining due process does not establish violation of a federal constitutional right actionable under 42 U.S.C. § 1983).

In light of the foregoing, Williams' claim that the correctional defendants violated his constitutional rights by failing to follow prison administrative regulations entitles him to no relief. The correctional defendants are entitled to qualified immunity on this claim.

To the extent Williams' amended complaint asserts a due process challenge regarding the custody level to which he was assigned following his classification review at Red Eagle in 2015,[4] the law is settled that

---

[4]Pursuant to the ADOC Classification Manual, inmates with a homicide conviction are prohibited from minimum-community (or work release) custody, the lowest custody level. (Doc. 22-5). The next lowest custody level is minimum-out. *Id.* Additionally, inmates with a homicide conviction must be within three (3) years of their end–of–sentence or parole date to be eligible for anything less than medium custody. *Id.* Prior to April of 2015, Williams was already at the lowest custody available to him at the time, minimum out, because of his manslaughter conviction. (Doc. 22-1). As a result, his custody did not change during his April 6, 2015 review. (Docs. 22-1, 22-4). In June of 2015, the Parole Board reviewed his case, denied him parole, and set off his next parole date to June of 2020. (Doc. 22-1). Consequently, Williams no longer met the three (3) year time frame for minimum-out custody due to his manslaughter conviction. *Id.* and

> there are only two instances when a prisoner may be deprived of a due process liberty interest under § 1983:  The first is when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court.  The second situation is when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.  *Kirby v. Siegelman*, 195 F.3d 1285, 1290-91 (11th Cir. 1999) (quotation omitted) (citing *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

*Morales v. Chertoff*, 212 Fed. App'x 888, 890 (11th Cir. 2006).  Williams' due process claim fails to implicate either of these situations because an inmate's assigned custody classification is not "so severe that it essentially exceeds the sentence imposed by the court," and the administrative regulations governing classification "do not bestow a benefit vis-a-vis the custody classification, the deprivation of which would result in an 'atypical and significant hardship' on [Plaintiff]."  *Morales*, 212 F. App'x at 890 (citing *Sandin*, 515 U.S. at 484); *Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994) (holding that Constitution affords no liberty interest in prisoner's custody classification); *Moody v. Daggett,* 429 U.S. 78, 87 n.9 (1976) (inmate has no constitutional right to receive a particular security classification); *Jones v. Diamond,* 594 F.2d 997 (5th Cir. 1979) (same); *see generally Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose.").

---

(Doc. 22-5).  Williams was, therefore, reclassified to medium custody on June 25, 2015, and transferred from a minimum level camp.  (Doc. 22-1).

Williams' claim the correctional defendants relied on incorrect information during his annual custody status review in 2015—*i.e.,* they relied on the personal identifying information of another inmate in ADOC custody when conducting his classification review—is without merit.   The undisputed evidentiary material submitted by the correctional defendants reflect the Central Records Division of the ADOC enters information of persons convicted of crimes and sentenced to the custody of the ADOC. As explained, personal identifying information for inmates in ADOC custody—*i.e.,* name, birthdate, social security number—is provided by the circuit clerk of the county of conviction via a certified transcript verifying the accuracy of the information and is provided pursuant to state statute.   ADOC officials have no authority to change information in those transcripts and agency regulations prohibit changes in their system until receipt of an amended transcript or by order of a court of competent jurisdiction. (Docs. 22-2, 22-3, 40-1).

Here, there is no admission by any correctional defendant or other prison official or other evidence tending to show that incorrect or erroneous information was used or relied on regarding Williams' 2015 annual classification review.   Williams has not come forward with any evidence the correctional defendants knowingly used another inmate's identity to classify him, and the undisputed records support no such finding.   *See* (Doc. 22-1).   Williams' conclusory allegation regarding the use of incorrect information does nothing more than raise the possibility that information in his records may be false, and this mere possibility fails to provide a basis for relief.   *Jones v. Ray*, 279 F.3d 944 (11th

Cir. 2001) ("[P]risoners cannot make a conclusory allegation regarding the use of [false] information as the basis of a due process claim.") *see also Monroe v. Thigpen*, 932 F.2d 1437, 1142 (11th Cir. 1991) (finding reliance on admittedly false information to deny a prisoner consideration for parole was arbitrary and capricious treatment violative of the Constitution). The correctional defendants are entitled to qualified immunity on this claim.

Finally, Williams' amended complaint references "retaliation" against the correctional defendants seemingly because he filed lawsuits against a former warden of Red Eagle and that prison staff—including the correctional defendants—who had worked under the former warden were still employed there when he returned to the facility in November of 2014. (Docs. 13, 45). No logical factual details are provided by Williams to support his claim of retaliation against the correctional defendants. Rather, he claims only that his prior litigation somehow prohibited his re-transfer to Red Eagle but that the transfer occurred because the correctional defendants refused to acknowledge his "true identity" as "Ronald Vincent Williams" despite being aware of the existence of another "Ronnie Williams"—who Williams maintains is a sex offender and requires mental health treatment—in the custody of the ADOC. *See* (Docs. 13, 45). The correctional defendants deny retaliating against Williams or having any knowledge of complaints he allegedly filed against a former warden of Red Eagle. (Docs. 22-2, 22-3).

A claim that a plaintiff was penalized for exercising a constitutional right is properly considered under the First Amendment. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 387 (6th

Cir. 1999) (*en banc*).  The First Amendment protects inmates from retaliation by prison officials for filing administrative grievances and lawsuits.  *Wright v. Newsome*, 795 F.2d 964 (11th Cir. 1986); *Farrow v West*, 320 F.3d 1235, 1248 (11th Cir. 2003).  "The gist of a retaliation claim is that a prisoner is penalized for exercising a right of free speech." *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989).  Conclusory allegations of retaliation, however, cannot demonstrate the existence of each element requisite to establishing retaliation.  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1266 (11th Cir. 2009), *overruled on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012), (stating that "in testing the sufficiency of the plaintiff's allegations, we do not credit ... conclusory allegations as true"); *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (Because prisoner retaliation claims are prone to abuse, "we are careful to require non-conclusory allegations").

In ruling on an inmate's First Amendment retaliation claim, courts use a burden shifting analysis.  *Moton v. Cowart*, 631 F.3d 1337, 1341–42 (11th Cir. 2011).  Williams must establish three elements: "(1) 'his speech or act was constitutionally protected'; (2) 'the defendant's retaliatory conduct adversely affected the protected speech'; and (3) 'there is a causal connection between the retaliatory actions and the adverse effect on speech.'" *Id.* at 1341 (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)); *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Thaddeus-X*, 175 F.3d at 397.  Regarding the causation prong a court "asks whether the defendants were subjectively motivated" by the plaintiff's protected act.  *Smith*, 532 F.3d at 1278.  If the plaintiff shows that "his

protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant." *Moton*, 631 F.3d at 1341–42 (quoting *Smith*, 532 F.3d at 1278).  Upon production of evidence demonstrating a legitimate reason for the conduct and/or actions in question, the plaintiff, with the ultimate burden of proof, must show there is a genuine dispute of material fact concerning the defendant's defense. *See Osterback v. Kemp*, 300 F.Supp.2d 1238, 1254 (N.D. Fla. 2003).  Federal courts must "carefully scrutinize" retaliation claims brought by prisoners challenging adverse actions of correctional personnel, *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), and "approach prisoner claims of retaliation with skepticism and particular care. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).  This is [necessary because prisoners'] . . . claims of retaliation are . . . easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.  This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

Although Williams' prior lawsuit was constitutionally protected speech, the second element of a retaliation claim requires him to demonstrate that the challenged actions "would likely deter a [prisoner] of ordinary firmness" from voicing complaints or filing legal actions challenging the behavior of correctional officers. *Smith*, 532 F.3d at 1277. This "presents an objective standard and a factual inquiry." *Id.*  There is nothing before

the Court that indicates the challenged actions would deter an ordinary inmate from filing lawsuits, and there is no evidence Williams was deterred in this pursuit.  But assuming, *arguendo*, this standard has been met regarding the alleged "prohibited" transfer to Red Eagle, Williams fails to satisfy the third requisite element of a retaliation claim—a causal connection between his constitutionally protected activities and the alleged adverse actions of any correctional defendant.  The causal connection inquiry focuses on the "subjective motivation of the defendants." *Thaddeus-X*, 175 F.3d at 399.  The subjective motivation issue is resolved by most courts under the burden-shifting formula in *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977).  This formula requires that Williams first meet "his burden of establishing that his protected conduct was a motivating factor behind any harm" and then "the burden of production shifts to the defendant.  If the defendant can show he would have taken the same action absent the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X,* 175 F.3d at 399 (citing *Mt. Healthy*, 429 U.S. 274).

The correctional defendants deny the allegations of retaliation made by Williams and deny any awareness or involvement of any prior complaints Williams filed against the former warden of Red Eagle.  To the extent Williams argues the mere fact he filed a prior lawsuit against the former warden supports his retaliation claim, he produces no evidence beyond his own conclusory allegations that the challenged actions of the correctional defendants were causally related to that conduct.  "A prisoner does not automatically cast doubt upon an institutional decision, nor is the decision 'subject to exhaustive challenge,'

solely because he was engaged in a First Amendment right." *Adams v. James*, 784 F.2d 1077, 1082 (11th Cir. 1986); *Adams v. James*, 797 F. Supp. 940, 949 (M.D. Fla. 1992); *Cranford v. Hammock*, 2010 WL 916031 *8 (N.D. Fla. 2010).

Here, Williams provides no facts from which the court could, at a minimum, infer a retaliatory motive by the correctional defendants beyond the allegation that despite knowing his "true identity," they allowed him to be transferred to Red Eagle in retaliation for complaints he filed against a former warden. No evidence has been presented that the correctional defendants knew of Williams' previous litigation or that they were personally affected by it, or these defendants had any input or involvement in his transfer to Red Eagle in November of 2014. Rather, Williams does nothing more than make the conclusory allegation that the correctional defendants somehow became aware of his previous lawsuits and that his later return to the facility was motivated by retaliation. This allegation is insufficient to defeat summary judgment. *Waddell v. Valley Forge Dental Associates, Inc*., 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

The record before the Court is devoid of admissible or potentially admissible evidence, direct or otherwise, from which a reasonable fact finder could infer the requisite motivating factor on the alleged act of retaliation. And the circumstances, when taken as a whole, do not support making such an inference. Because Williams' allegation against

the correctional defendants fails to support a First Amendment retaliation claim, they are entitled to qualified immunity.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      Defendants' Motions for Summary Judgment (Docs. 22, 27, 40) be GRANTED.

2.      Judgment be GRANTED in favor of Defendants.

3.      This case be DISMISSED with prejudice.

4.      Costs be taxed against Plaintiff.

It is further

ORDERED that on or before **April 19, 2019**, the parties may file an objection to the Recommendation.  Any objection filed must specifically identify the factual findings and legal conclusions in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or general objections will not be considered by the District Court. This Recommendation is not a final order and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice.  11th

Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

     Done, this 5th day of April, 2019.

                      /s/ Stephen M. Doyle
                      UNITED STATES MAGISTRATE JUDGE